UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JESSICA SHELL and PHILIP SHELL, and the marital community comprised thereof,<br><br>       Plaintiffs,<br><br>       v.<br><br>FERRY COUNTY; FERRY COUNTY SHERIFF'S DEPARTMENT, SHERIFF PETE WARNER, DEPUTY TALON VENTURO, DEPUTY PATRICK RAINIER, DEPUTY ODEGARD, DEPUTY WINTERS, PAMELA STODDARD, BRAD MILLER, and VALERIE MACINTYRE,<br><br>       Defendants. | NO. 2:16-cv-00021-SAB<br><br>**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** |

Before the Court is the Ferry County Defendants' Motion for Summary Judgment, ECF No. 24. The motion was heard without oral argument. Plaintiffs are represented by Douglas Phelps. Defendants are represented by Brian Christensen.

///

///

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 1**

## Motion Standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 325; *Anderson*, 477 U.S. at 248.

In addition to showing there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. University of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. *Celotex*, 477 U.S. at 323. The non-moving party cannot rely on conclusory allegations alone to create an issue of material fact. *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993).

When considering a motion for summary judgment, a court may neither weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## Background Facts

Ferry County Sheriff Dispatch received a letter, dated January 19, 2013, from Forget Me Not Animal Shelter regarding an emaciated and wounded dog. The letter, written by Kim Gillen, the Executive Director of the Shelter, details the

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 2**

receipt of a Pitbull on January 17, 2013 that was extremely thin and with possible frostbite and includes the conclusion by two vets that the dog had not been lost for a long time, but was instead receiving inadequate food and medical care at his home. The letter goes on to explain that on January 18, 2013, the Shelter received an anonymous message that said the dog's name was Brewster, that he was owned by Phil "Steel" and Jessica "Shaw," who have been breeding and attempting to sell Pitbulls, and there may be 14 or more dogs and puppies in similar condition. The person also expressed concern about some small children that are living at the residence in possibly unfit conditions.

Ms. Gillen provided an address that she thought was the Shell's based on a previous Shelter interaction with Ms. Shell, as well as Ms. Shell's phone number. The Shelter requested the Sheriff's Department conduct a welfare check on the pets at the residence and also indicated that based on the condition of the Pitbull currently at the Shelter, Ms. Gillen was in favor of cruelty charges being brought against the owners.

**The Initial Search**

A few days later, on January 24, 2013 around 8:30 a.m., Deputy Talon Venturo and another agent[1] conducted the requested welfare check. Plaintiffs' residence is located at 95 Goodrich Road, or Forest Service Road 2149. While attempting to drive to the residence they were unable to drive any further than the intersection of the North Fork Trout Cr and Forest Service Road 2149. North Fork Trout Cr was plowed to the Empire Snow Park, so the officers parked the patrol vehicle at the Snow Park and rode the Sheriff's Office snowmobiles to the residence. Specifically, they rode the snowmobiles about a mile up to the

---

[1] In their Amended Complaint, Plaintiffs allege that Defendant Rainier participated in the search with Deputy Venturo. In his report, Deputy Venturo identified the person assisting him as Agent Orozco.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 3**

driveway, which was gated. They then walked down the driveway, which was approximately 250 yards to the two-story house.

According to Ms. Shell, there are double gates at the driveway's intersection with Forest Service Road 2149, which were closed with a chain the day in question. In addition to the closed gate, there were numerous signs at the gate and in the surrounding area indicating no trespassing, no hunting, and no entry onto the property. The house is located in a very rural, thickly forested area and the house is not visible from Forest Service Road 2149.

While walking down the driveway, Deputy Venturo saw four puppies running loose and an adult female dog on a run line. He observed rib lines on two of the puppies. He then walked to the residence and knocked on the door. An 8-year old boy answered the door followed by a 5-year old boy. The 5-year old boy yelled at them to leave. Deputy Venturo asked if their parents were home. The 5-year old said his parents went to Colville. The boys had shoulder-length hair that was matted. Both children were dirty and it appeared they had not been bathed in a while. Deputy Venturo saw dog feces on the concrete floor. When Deputy Venturo asked the children if they were going to school, the younger one told him he needed to leave.

Deputy Venturo and the other agent then decided to leave the residence. While walking back, Deputy Venturo heard a puppy in the woodshed. He walked over to the woodshed and observed a small brown puppy on a chain with no food and water. They walked back to the snowmobiles and retuned back to the Snow Park.

Deputy Venturo then contacted dispatch to contact Child Protective Service. He also contacted the county road department to get a grader to plow the road and requested that a representative from Forget Me Not Shelter come to the residence. The grader took about 1.5 hours to plow the Goodrich Road/Forest Service Road 2149.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** ~ 4

**The Second Visit to the Shell Residence**

Deputy Venturo and the others present then drove up Forest Service Road 2149 and parked at the gate in front of Plaintiffs' residence. Deputy Venturo and the CPS workers walked down to the residence while Border Patrol agents assisted the animal shelter volunteers who were checking the dogs. Deputy Venturo and the CPS workers contacted the children at the house and asked them if they wanted to go into town and get some food. The children came outside. They were walked up the driveway and placed in the CPS vehicle. At some point, the Shells returned from their trip and were notified by CPS that CPS had a pick-up order for their youngest child. The youngest child was also taken into protective custody by CPS.

**Defendant Valerie MacIntyre**

Dependency proceedings were initiated by CPS. Defendant Valerie MacIntyre was appointed guardian ad liem for Plaintiffs' three minor children. Plaintiffs felt pressured with no way out and subsequently signed relinquishment papers. Throughout the dependency proceedings, Defendant MacIntyre made comments to Plaintiff Jessica Shell regarding her husband, including that she would never regain custody of her children if she stayed with her husband, that she should come live with Ms. MacIntyre in an apartment in Colville, and that she would never leave Ms. Shell alone.

**Conversation with Brad Miller**

Defendant Brad Miller is a Ferry County Commissioner. Early in January, 2013, Ms. Shell contacted him regarding the snow berms that the county groomer had been leaving both at the intersection of her driveway with Forest Service Road 2149 and at the intersection of Forest Service Road 2149 and North Fork Trout Creek Road. The berms were making the road nearly impassable. According to Plaintiffs, they had lived in the house for six years and they never had a problem until 2013 when the groomer started creating snow berms. In his declaration, Mr. Miller states that Ms. Shell asked him to have her road plowed. He says he

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 5**

explained to her that she lived on a federal forest service road that was not maintained in the winter and the county would not plow her road.

**October 28, 2014 Visit to the Shell Residence**

Sometime later, Jessica and Phillip Shell were charged with attempted murder that was downgraded to felony harassment.[2]

Ms. Shell was arrested and detained on these charges, but an Order for Pretrial Release was entered on October 27, 2014 in Ferry County Superior Court. Ms. Shell executed a $30,000 property bond and she agreed to the following conditions:

> Defendant will surrender all her firearms to law enforcement – a deputy will escort her to her residence and take possession of the guns and shall be authorized to search for firearms to ensure total retrieval.

The next day, Deputy D. Odegaard, Deputy Gordon Winters, and Corrections Officer Reese transported Ms. Shell to her residence. Her attorney, M. Von Sauer, also drove to the residence. While in route, Deputy Odegaard asked Ms. Shell how many guns were at her house. She stated 4 or 5 guns—a .22 caliber rifle, shot gun, handgun and one or two rifles in the storage unit.

At the house, the deputies told her attorney that he was to stay inside the vehicle for his and the officer's safety. Mr. Von Sauer said he understood. Deputy Odegaard told Mr. Von Saur that if he needed the officers for something, he should honk his horn and Deputy Odegaard would come outside and meet with him.

Deputy Winters began taking photographs of the area. Ms. Shell was brought inside the house and placed on the couch. She was still in handcuffs. Deputies found a handgun in a coat that was by the front door. It was loaded and had an additional magazine in the other pocket.

The deputies proceeded upstairs and found a rifle and shotgun. The guns were located on the left wall at the top of the stairwell, where Ms. Shell had said

---
[2] The charges were ultimately dismissed.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 6**

they would be located. The deputies then proceeded to search the master bedroom. They found several guns, shooting and hunting magazines, a handgun box, a Shooting Times magazine, as well as several rounds under the bed. A metal style lock box was also under the bed and inside the locked box were several boxes of ammunition. In the top drawer of a dresser they found two 40-round AK47 black polymer magazines, another magazine, and ammunition. In the second drawer they found two sets of handcuffs and keys.

In an upstairs bathroom, there was a black bolt action receiver with a stainless bull barrel. There was no stock on this gun. In another room, there were multiple books explaining how to shoot and how to reload ammunition. The officers took pictures of these books. A box that was full of ammunition and ammunition supplies were found. Multiple reloading tools and knives were found on a work bench along with a tool box with more reloading supplies and a piece of wood with a rifle stock stretched on it. In another room, pistol ammunition was found on a tote.

Although they searched the first floor of the house, they did not find any firearms, but multiple knives were lying throughout the house. They then searched the shipping container. Ms. Shell went outside to help the officers locate the guns. At first, they could not locate them because there were totes in the way. Eventually, with her help, the deputies found two rifles, coolers that were filled with ammunition, and other boxes filled with ammunition.

They then searched the two vehicles that were on the property. They found a brown leather gun holster in one of the vehicles, but they did not remove it from the vehicle. They then placed all the "recovered weapons, ammunition, reloading material, etc. into our patrol units and left the scene." The search lasted three and a half hours.

Ms. Shell stated in her declaration that she believed her attorney would be present during the search. She stated that the deputies ransacked her house when

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 7**

they conducted the search. Her cedar hope chest was broken and all her possessions were strewn everywhere. The books on reloading and reloading equipment were seized. Cash was removed from her TV stand, and some silver coins, a watch and gemstones were also taken. When the firearms were returned to her, things were missing, including over half of her ammunition.

## Section 1983

To state a claim under § 1983, Plaintiffs must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated; and (2) that the alleged violation was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Naffe v. Frey*, 789 F.3d 1030, 1035 (9th Cir. 2015).

## Analysis

**1. First Entry onto Plaintiff's Property**

Defendants argue they did not violate Plaintiffs' constitutional rights when they entered their property on snowmobiles because they were authorized to do so under the "knock and talk" exception to the warrant requirement, and as such, they did not conduct a search of the property. They also assert they were performing their community caretaking functions with respect to the welfare of the dogs. Finally, Defendants maintain they are entitled to qualified immunity

**a. Warrantless Search**

At the very core of the Fourth Amendment "stands 'the right of a man to retreat into his own house and there be free from unreasonable government intrusion.'" *Florida v. Jardines*, __ U.S. __, 133 S.Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window." *Id.* Thus, searches and seizures inside

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 8**

the home without a warrant are presumptively unreasonable and because the curtilage is part of the home, searches and seizures in the curtilage without a warrant are also presumptively unreasonable. *Oliver v. United States,* 466 U.S. 170, 180 (1984).

A government agent conducts a "search" within the meaning of the Fourth Amendment when the agent infringes "an expectation of privacy that society is prepared to consider reasonable," *United States v. Jacobsen*, 466 U.S. 109, 113, (1984), or "physically occupie[s] private property for the purpose of obtaining information." *United States v. Jones*, 565 U.S. 400, 406 n.3 (2012) ("Where, as here, the Government obtains information by physically intruding on a constitutionally protected area, such a search has undoubtedly occurred"); *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012).

Here, there is no question the officers entered Plaintiffs' private property to investigate animal cruelty charges and to conduct a welfare check on the animals. Their argument that they did not conduct a "search" is not supported by the case law as set forth above. Because private property, including the home and its curtilage, are constitutionally protected areas, the officers needed to obtain a warrant to enter the property to conduct the search, or demonstrate that an exception to the warrant requirement existed.

Defendants argue that two exceptions to the warrant requirement are present: (1) the knock and talk exception; and (2) the community caretaking function. Neither of these exceptions excuses the officers' warrantless search of Plaintiffs' private property.

### (i) Knock and Talk Exception

"Law enforcement officers may encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001) (overruled on other grounds, *Perea-Rey*, 680 F.3d at 1187.) The "knock and talk" exception to the warrant requirement is similar to

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 9**

the exception for consensual searches. *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016). The "consent" in a "knock and talk" case is "implied from the custom of treating the 'knocker on the front door' as an invitation (*i.e., license*) to approach the home and knock." *Id.* (citing *Jardines*, 133 S.Ct. at 1415 (citation omitted)). "The scope of the exception is coterminous with this implicit license. Stated otherwise, to qualify for the exception, the government must demonstrate that the officers conformed to 'the habits of the country' by doing 'no more than any private citizen might do.'" *Id.* (citations omitted). In the typical case, if the police do not have a warrant they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* (citation omitted).

The application of the "knock and talk" exception, then, ultimately "depends upon whether the officers have an implied license to enter the curtilage, which in turn depends upon the *purpose* for which they enter." *Id.* (citations omitted, emphasis in original). Thus, the "knock and talk" exception depends at least in part on an officer's subjective intent. *Id.* "Officers who knock on the door of a home for other purposes generally exceed the scope of the customary license and therefore do not qualify for the "knock and talk' exception." *Id.*

Here, the facts indicate this case is not the typical case. First, there is nothing in the record to suggest the officers only wanted to talk to Plaintiffs. Rather, the letter from the Shelter makes clear the officers entered Plaintiff's property to investigate potential animal cruelty charges and to conduct an animal welfare check. Notably, after Deputy Venturo decided to leave the residence, he searched a woodshed because he heard a puppy barking. Second, the record is clear that the officers did not have an implied license to approach the home and knock. The house was not visible from the road. There were numerous no trespassing signs, extensive foliage surrounding the house and curtilage, and gates blocking the driveway. A private citizen approaching the property would not believe that they

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** ~ 10

were invited to enter the property. *Jardines*, 133 S.Ct. at 1414 (holding officers are not permitted to gather information "by physically entering and occupying the area not explicitly or implicitly permitted by the homeowner."); *see also State v. Jesson*, 142 Wash.App. 852, 859 (2008) (concluding a reasonable, respectful citizen would not believe he could enter the property, given the "No Trespassing" signs, the closed gate, the primitive road and the secluded location of the home).

### (ii) Community Caretaking Function

Two well-delineated and recognized exceptions to the warrant requirement are exigent circumstances and emergency. *Hopkins v. Bonvicino*, 573 F.3d 752, 761 (9th Cir. 2009). "These exceptions are 'narrow' and their boundaries are 'rigorously guarded' to prevent any expansion that would unduly interfere with the sanctity of the home." *Id.* (quotation omitted). The emergency exception stems from the police officers "community caretaking function" and allows them to respond to emergency situations that threaten life or limb. *Id.* That said, "a police officer may not enter a home to investigate a medical emergency or other immediate risk to life or limb unless he has 'reasonable grounds' to believe an emergency is at hand and his immediate attention is required." *Id.*

Here, the facts do not support a finding that exigent or emergency circumstances existed that would justify the warrantless entry and search of Plaintiffs' private property. The referral letter was written on January 19, 2013. It was not until several days later that the Sheriff's Department decided to investigate the animal cruelty concerns and conduct a welfare check. The cases cited by Defendants in their reply do not support their arguments that they were permitted to conduct a warrantless search. In those cases, at the minimum, the animals were in grave danger of perishing or extreme distress. There is nothing in the record that indicates the officers or Forget Me Not Shelter were concerned that the animals on Plaintiffs' property were facing immediate or life-threatening risk to life or limb. Notably, none of the animals were seized at any time during the investigation.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** ~ 11

Moreover, the letter provided Jessica Shell's telephone number, but there is nothing in the record indictating the officers even attempted to call Ms. Shell to obtain permission to enter the property.

Here, a reasonable jury could find that no factual basis existed to justify the officers' warrantless entry onto Plaintiff's private property and consequently the officers violated Plaintiffs' constitutional rights when they conducted a warrantless search.

**2.      Second Entry onto Plaintiffs' Property**

If the first search of Plaintiffs' property is unconstitutional, any subsequent search based on the information gained from the illegal search cannot be used to justify the second time officers entered Plaintiffs' property without a warrant. *See Walker v. King Cnty.*, 2010 WL 1513836 (9th Cir. 2010) (unpublished) (holding second search of house was unlawful because it was based on information obtained during unlawful entry and rejecting justification for exigent circumstances: "Moreover, even if exigent circumstances justifying a warrantless search existed after Defendants entered the home, Defendants learned of such circumstances only as a result of this unlawful entry, questioning and arrest.").

A reasonable jury could find that the officers violated Plaintiffs' Fourth Amendment rights again when they entered the property a second time without first procuring a warrant. Notably, it took several hours for the snow plow to clear the path for the officers and CPS to gain access to Plaintiffs' property. There is nothing in the record to explain why the officers did not use this time to procure a warrant if they believed they had probable cause to reenter the property. Also, although the children were unsupervised, there is nothing in the record to suggest they were in immediate danger or a life threatening situation. If they were, then it is likely the officers would have removed the children the first time they encountered them, rather than wait a couple of hours before removing them from their home.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 12**

### 3. Third Search at Plaintiffs' Residence

Plaintiff Jessica Shell alleges Defendant Venturo, Odegard, and Winters violated her constitutional rights in two ways when they conducted a search pursuant to the Release Order issued by Ferry County Superior Court: first, the officers exceeded the scope of the warrant; and second, the officers violated her constitutional rights when they brought her into the house with them when they conducted the search but made her counsel wait in the car.

#### a. Execution of the Search Warrant

The Fourth Amendment prevents "general, exploratory searches and indiscriminate rummaging through a person's belongings." *United States v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004). If the "scope of the search exceeds that permitted by the terms of a validly issued warrant ... [the search and any] subsequent seizure [are] unconstitutional." *Horton v. Calif.*, 496 U.S. 128, 140 (1990).

Also, the Fourth Amendment prohibits "unreasonable" searches and seizures. *Id.*, 496 U.S. at 133. The reasonableness of a search or a seizure depends "not only on when it is made, but also on how it is carried out." *Tennessee v. Garner*, 471 U.S. 1, 7–8, (1985). In other words, even when supported by probable cause, a search or seizure may be invalid if carried out in an unreasonable fashion. *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).

Questions of material fact exist whether the officers exceeded the scope of the court order authorizing the search. The undisputed evidence is that the officers took photographs of Plaintiffs' property and seized additional materials not authorized by the search warrant, *i.e.* books, loading supplies, and ammunition. Plaintiff Jessica Shell testified the officers ransacked her house and they took money and gems. A jury will have to determine whether this search exceeded the scope of the court order and whether the officers carried the search out in an unreasonable fashion. As such, summary judgment is not appropriate on this claim.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** ~ 13

### b. Sixth Amendment Right to Counsel

Plaintiff Jessica Shell asserts that her Sixth Amendment Right to Counsel was violated when she was brought into the house while the officers searched it, but her counsel was not permitted to join her. Even assuming Plaintiff is correct that the officers intruded on her attorney-client relationship, such an intrusion is not, in and of itself, a violation of the Sixth Amendment. *United States v. Irwin*, 612 F.2d 1182, 1186 (9th Cir. 1980). Rather, the right is only violated when the intrusion substantially prejudices her. *Id.* The Ninth Circuit has instructed that prejudice can manifest itself in several ways, including when evidence gained through the interference is used against the defendant at trial; when prosecutors use confidential information obtained through the interference that pertains to the defense plans and strategy; when government influence destroys the defendant's confidence in her attorney; or any other action designed to give the prosecution an unfair advantage at trial. *Id.*

In this case, Plaintiff has not alleged or demonstrated any prejudice that resulted from her sequestration from her counsel. As such, summary judgment in favor of Defendants on Plaintiff's Sixth Amendment claim is appropriate.

### 4. Qualified Immunity

Qualified immunity protects government officers from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, the court answers two questions: whether the alleged misconduct violated a right and whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This inquiry "must be undertaking in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). That said, officers can still be on notice that their conduct violates established law even in

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 14**

novel factual circumstances. *Hope v. Pelzer*, 536 U.S. 730, 741(2002). The salient question is whether the state of the law at the time of the events (here, January, 2013) gave the deputies "fair warning" that their conduct was unconstitutional. *Mendez v. Cnty of Los Angeles*, 815 F.3d 1178, 1186 (9th Cir. 2016).

Having determined that a reasonable jury could find that the officers violated Plaintiffs' constitutional rights, the Court needs to determine whether the right at issue was clearly established at the time of the alleged misconduct. With respect to the events taking place on January 24, 2013, it was clearly established that a warrant is needed before officers can search a person's private property, absent exigent circumstances. *Kentucky v. King*, 563 U.S. 452, 459-60 (2011). In 2012, the U.S. Supreme Court reiterated that for purposes of Fourth Amendment analysis, a search occurs when the government physically occupies private property for the purpose of obtaining information. *Jones*, 565 U.S. at 404. Thus, the officers were on notice that they were required to obtain a warrant before entering Plaintiffs' private property to obtain information. Additionally, officers were on notice that a constitutional violation occurs when government officers violate a person's "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 351 (1967); *Jones*, 565 U.S. at 406; *Mendez*, 815 F.3d at 1187 ("In 2010, the law was clearly established that a 'search' under the Fourth Amendment occurs when the government invades an area in which a person has a 'reasonable expectation of privacy. . . This includes the 'area immediately adjacent to a home,' known as the curtilage."). The officers were on notice that they did not have an implied license to enter the property, given the "No Trespassing" signs, the closed gates, the secluded location of the home, and the long driveway to the house. *See Jesson*, 142 Wash.App. at 859; *United States v. Johnson*, 256 F.3d 895, 903-04 (9th Cir. 2001) (recognizing that state law is relevant in determining the reasonableness of police activities under the Fourth Amendment). The officers were also on notice that the community caretaking function does not apply where

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 15**

they enter private property to search for evidence of a crime or there is a lack of the need for emergency medical assistance. *See State v. Gocken*, 71 Wash. App. 267, 275 (1993).

With respect to the October 28, 2014 search, questions of material fact remain that precludes the granting of qualified immunity. Moreover, it is well-established that a search or seizure may be invalid if carried out in an unreasonable fashion. *See Foxworth*, 31 F.3d at 876; *Davis v. United States*, __ F.3d __ (2017 WL 1359462 *6 (9th Cir. Apr. 13, 2017) (holding officers are not entitled to qualified immunity as a matter of law where genuine issues of material fact exist regarding whether the seizure was reasonable).

**5. Claims against County Commissioners Pamela Stoddard and Brad Miller**

The underlying basis for Plaintiffs' claims against the County Commissioners is that Plaintiffs contacted Defendants Stoddard and Miller requesting that the snow blocking their driveway be cleared so they could exit their property, yet the roads were never plowed. Plaintiffs argue that by allowing them to be plowed in and refusing to assist in the removal of the roadblock, these Defendants violated their constitutional right to use the public roadway.

In their response to Defendant's Motion for Summary Judgment, Plaintiffs argue that Defendants Stoddard and Miller were negligent in failing to address the winter upkeep issues on Forest Service Road 2149. Negligence, however, is not the standard for a constitutional violation.[3] *See T.L. Baker v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law).

Moreover, while the U.S. Supreme Court has recognized a fundamental right

---

[3] A review of the Amended Complaint reveals that Plaintiffs are not bringing state negligence claims against Defendants.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 16**

to interstate travel protected by the Due Process Clause, *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969) ("The constitutional right to travel from one State to another occupies a position fundamental to the concept of our Federal Union), no court has addressed whether citizens have a constitutionally protected liberty interest in travel within a state or municipality. *See Fruitts v. Union Cnty.*, 2015 WL 5232722 (D. Or. Aug. 17, 2015) (listing district courts cases that have refused to expand the constitutional liberty interest to include a right to intrastate travel). Finally, even if this Court were to recognize that the failure to eliminate snow berms caused by the grooming of the road is somehow a constitutional violation, Defendants Stoddard and Miller are entitled to qualified immunity because such a right was not clearly established at the time of the incident. *See Pearson*, 555 U.S. at 231 (holding qualified immunity shields defendants from liability if their conduct did not violate clearly established constitutional rights.

Summary judgment in favor of Defendants Stoddard and Miller is appropriate.

**5.** ***Monell* Liability**

Although the term "person" as set forth in 42 U.S.C. § 1983 includes municipalities, a municipality cannot be held liable under 1983 on a respondeat superior theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Liability may attach to a municipality only where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted).

///

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 17**

There are also limited circumstances where a municipality can be held liable for inadequate training. *Connick v. Thompson*, 536 U.S. 51, 61 (2011). In such a case, the municipality would be liable if a concededly valid policy is unconstitutionally applied by a municipal employee who has not been adequately trained and the constitutional wrong has been caused by the failure to train. *Id.* Inadequacy of training may serve as a basis for § 1983 liability, however, only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

Plaintiffs allege that Defendant Ferry County failed to ensure the residents are safe from unreasonable search and seizure, failed to properly maintain roadways allowing residence access to their property and community services, and failed to properly supervise guardians ad litem through the CASA program. Plaintiffs also allege that Defendant Ferry County Sheriff's Department failed to properly supervise law enforcement officers.

For the most part, Plaintiffs have not provided any evidence to support their *Monell* claims, and as such, summary judgment is appropriate. With respect to the failure to properly supervise law enforcement officers, however, Plaintiffs cite to the case of *State v. Jesson*, 142 Wash. App. 852 (2008). In that case, the Washington Court of Appeals concluded that a Ferry County Sheriff's officer violated Mr. Jessen's constitutional rights when he entered Mr. Jessen's property to investigate a crime without a warrant. *Id.* at 857. Mr. Jessen lived in a secluded, rural area. *Id.* He had a closed gate that was marked with "No Trespassing" signs and his house was not visible from the road. *Id.* The facts in that case are very similar to the case at bar. As such, questions of material fact exists regarding Plaintiffs' *Monell* claim based on Defendants' failure to train and supervise law enforcement officers and summary judgment with respect to this claim is not appropriate.

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART** ~ 18

### 6. Valerie MacIntyre

Plaintiffs assert that Defendant Valerie MacIntyre improperly made misrepresentations to the court and DSHS regarding Plaintiffs and attempted to make improper and invalid deals with Plaintiff Jessica Shell contingent on separation from her husband.

The United States Supreme Court has held that all persons who perform functions that are an "integral part of the judicial process" are immune from liability. *Briscoe v. LaHue*, 460 U.S. 325, 335 (1983). Social workers are entitled to absolute quasi-judicial immunity in performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings. *Meyers v. Contra Costa Cnty. Dep't of Soc. Serv.*, 812 F.2d 1154, 1157 (9th Cir. 1987). However, only qualified, not absolute, immunity is available to the extent social workers make discretionary decisions and recommendations that are not functionally similar to prosecutorial or judicial decisions. *Miller v. Gammie*, 335 F.3d 889, 897 (9th Cir. 2003). Examples of such functions may include decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care. *Id*.

The Ninth Circuit instructs that qualified immunity analysis with respect to judicial deceptions/misrepresentation claims requires Plaintiffs to make two showings: (1) substantial showing of deliberate falsehood or reckless disregard for the truth and (2) establish that, but for the dishonesty, the challenged action would not have occurred. *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002); *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997). This analysis intertwines the qualified immunity question—whether a reasonable officer should have known that she acted in violation of plaintiff's constitutional rights—with the substantive recklessness or dishonesty question. *Butler*, 281 F.3d at 1024.

Here, Plaintiffs have not made the required substantial showing of deliberate falsehood or reckless disregard for the truth. They have not identified any specific

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 19**

statements made by Defendant MacIntyre and thus have not made any showing that any particular statement was false or untruthful. Moreover, Plaintiffs have not identified any constitutional right that was infringed by Defendant MacIntyre's alleged deal making. As such, summary judgment in favor of Defendant MacIntyre is appropriate.

## 7. Conclusion

Because a reasonable jury could find that Defendants violated Plaintiffs' Fourth Amendment rights, summary judgment on these claims is not appropriate. Also, there is enough evidence in the record for Plaintiffs' *Monell* claim regarding warrantless searches of private property to proceed to the jury. On the other hand, summary judgment is appropriate on Plaintiffs' remaining *Monell* claims and claims against Defendants Stoddard, Miller and MacIntyre.

Accordingly, **IT IS HEREBY ORDERED**:

1. Defendant's Motion for Summary Judgment, ECF No. 24, is denied, in part; and granted in part.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and to provide copies to counsel.

**DATED** this 28th day of April 2017.



Stanley A. Bastian
United States District Judge

**ORDER DENYING FERRY COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, IN PART; GRANTING IN PART ~ 20**